## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## NORTHERN DIVISION

| | | |
|---|---|---|
| ALBERT R. MIGNEAULT | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | Case No. 2:14 CV 21 CDP |
| | ) | |
| CAROLYN W. COLVIN | ) | |
| Acting Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## <u>MEMORANDUM AND ORDER</u>

Claimant, Albert Raymond Migneault , appeals to this Court to review the

decision of the Social Security Commissioner to deny his application for

supplementary security income (SSI) under Title XVI of the Social Security Act.

42 U.S.C. §§ 1381 et seq.  Migneault claims disability because of several

impairments, including chronic obstructive pulmonary disorder (COPD), shortness

of breath, hand tremors, bipolar disorder, depression, and mood disorder.  After a

hearing, an Administrative Law Judge determined Migneault is not disabled and

thus ineligible for SSI.  After the ALJ's decision, Migneault submitted new

evidence to the Social Security Appeals Council to be considered in his

application.  Even in light of the new evidence, I affirm the ALJ's decision because

I find it supported by substantial evidence when considering the record as a whole.

## I.  Procedural Background

Migneault filed an application for SSI on February 8, 2011, initially alleging disability beginning August 15, 2006.  The District Office of the Social Security Administration denied the claim on May 10, 2011, and Migneault requested a hearing on May 24, 2011.  Before the hearing took place, Migneault amended the date of disability to February 16, 2011.  After a hearing held on September 25, 2012, ALJ Mark A. Clayton denied the claimant's application through a written opinion issued on October 25, 2012.  Migneault filed a timely appeal of the ALJ's decision with the Appeals Council and submitted new evidence in support of his application.  The new evidence consists of a clinical visit record, a Physician's Assessment for Social Security Disability questionnaire, and a Medical Assessment checklist, all completed by the same treating physician.  The Appeals Council declined review on December 19, 2013.  The ALJ's decision then became the final decision of the Commissioner.  *Van Vickle v. Astrue,* 539 F.3d 825, 828 (8th Cir. 2008).  In his appeal here, Migneault argues the ALJ's decision is contrary to the weight of the evidence now on the record.

## II.  Evidence Before the ALJ

### A. Claimant's Application for Benefits and Testimony Before the ALJ

Migneault filed an Adult Function Report with the help of his ex-wife, Marilyn Migneault, as part of his application for benefits.  (Tr. 238-48)  He reports

that his daily activities include taking his dogs outside, cooking, and doing laundry; he does these tasks with the help of his ex-wife. He also reads the newspaper and watches television, but he cannot concentrate on those activities for more than thirty to forty-five minutes. Since his disabilities began affecting him, he reports sleeping more, being a less able cook, and being limited by inability to breathe if he moves too much. Migneault only goes outside to let out his dogs, go to doctors' appointments, or go the grocery store, but he cannot go alone because he has previously had "passing out spells" after severe coughing. (Tr. 241) He cannot drive because his driver's license was revoked. Migneault's ex-wife reminds him to take his medications and to attend to his personal care and grooming. He reports having several problems with his mobility because of his knees, and he cannot lift more than 20 pounds or walk more than 50 feet before needing to rest and catch his breath. Migneault stated that he "blows up" at authority figures and does not handle stress well. (Tr. 244)

Before the ALJ in the hearing, Migneault testified that he suffers from a number of mental illnesses, including bipolar disorder, depression, and mood disorder. He spends most days inside the home he shares with his ex-wife, and he avoids leaving because he does not want to interact with other people. He attributes wanting to be left alone to his bipolar disorder. He testified that even if he had a valid driver's license, he would not drive because of those previous

instances in which he has lost consciousness after severe coughing. At home, he spends time with his ex-wife and helps with household chores, such as laundry, cooking, and caring for his dogs; he spends the majority of his day seated in a chair because he tires easily. He testified does not watch television or read while he sits, but he talks to his ex-wife. Migneault reported he has difficulty understanding and remembering instructions and getting along with others. When questioned by the ALJ, Migneault reported that he would have trouble walking more than a block without taking a break to rest. However, he would be able to stand for two to three hours at a time, and he would have no trouble sitting for an indefinite period of time. He also indicated he would be able to pick up and carry up to ten pounds multiple times throughout a day. (Tr. 48-50).

Migneault testified that bipolar disorder, depression, and mood disorder are his three most serious impairments that prevent him from working. In the past, he has had suicidal and homicidal thoughts, but these are now controlled by medication. Mood disorder also causes him to lose his temper easily, but he reported that has also been controlled by medication. Physically, Migneault ranks his most serious impairments as COPD and emphysema; the shortness of breath caused by these two ailments prevents him from exerting himself even lightly, and he testified again that he cannot walk more than a block before needing to stop to catch his breath. He uses multiple breathing treatments prescribed by his doctor,

including a nebulizer and inhalers, several times throughout the day. He uses an oxygen pump at night while he sleeps, but he typically does not need to use it during the day. Finally, he noted that he has suffered a series of strokes, which have created numbness in one of his hands, and a series of heart attacks.

Migneault testified he most recently worked as a cashier and stocker in 2005. As a convenience store cashier, he was also tasked with stocking the shelves, and he occasionally lifted objects as heavy as 60 pounds. Migneault worked at the store until it closed. Prior to this position, he worked as a mechanic and auto body repairman at a used truck lot, from 1994 through 1999. He eventually stopped working at the used truck lot because the dust in the air began to exacerbate his breathing difficulties.

B. Corroborating Statements of Third Parties

Migneault's ex-wife, Marilyn, submitted a Third Party Function Report and a letter in support of his application for SSI. (Tr. 216-23, 791) Migneault's friend, Donna Leach, also submitted a letter describing his impairments, largely echoing his ex-wife's observations. (Tr. 792-93) Marilyn wrote that Migneault's physical impairments began with shortness of breath, and this condition has worsened over the years. She believes his history of strokes and heart attacks have also contributed to his decline in energy level. Since his impairments have worsened, Marilyn reported that Migneault spends much more time sleeping than he did

previously, and he tires easily.  She wrote that Migneault spends 30 to 45 minutes a day helping with household chores, such as laundry, caring for pets, and doing some limited cooking.  While doing chores, however, he has to take breaks to rest. Migneault only leaves their home to go to the grocery store and let the dogs out. When he does so, he cannot go alone because he has had fainting spells.  He can only walk a very short distance before having to stop and catch his breath.  She has also noticed tremors in his hands and says he complains of numbness in them. Marilyn reported that Migneault loses his temper easily, has a short attention span, and does not handle stress well.

Leach also reported that she has noticed Migneault frequently has to stop doing his household chores to catch his breath and has tremors in his hands.  Like Marilyn, Leach indicated Migneault's mood has declined over the last several years, and she wrote that he now frequently appears depressed, loses his temper quickly, and has a short attention span.

C. Medical Records – Physical Impairments

The record contains several years of medical records for Migneault, ranging back far beyond the date on which he claimed disability.  He has a lengthy history of treatment for his COPD, shortness of breath, and chest pain, both from his primary care physician and emergency room doctors.  As a young man, he abused several different kinds of illicit drugs and alcohol, but he has not engaged in such

use for many years.  Migneault's medical history indicates he has been a cigarette

smoker for several years, and he has attempted to cut down on or stop smoking

repeatedly, but it does not appear he has ever been completely successful.

*Clinical Treatment Notes and Emergency Room Records*

On February 2, 2011, shortly before he submitted his application for SSI,

Migneault went to the emergency room after experiencing chest pain while

shoveling snow from his driveway.  (Tr. 568)  He testified that doctors told him he

had suffered a heart attack, but a chest x-ray and stress echocardiogram showed no

irregularities.  The treatment record indicates the physician, Dr. Tillman, urged

Migneault to avoid exerting himself with strenuous activities.

The major portion of the record that contains evidence related to Migneault's

physical impairments consists of a series of clinical treatment notes written by Dr.

Matthew Griffin, Migneault's primary care physician.  (Tr. 864-97)  The treatment

notes span a period between March 5, 2011 and September 17, 2012, and they

reveal that the focus of Migneault's visits with Dr. Griffin is treatment of COPD

symptoms.  On March 5, 2011, Migneault complained of severe coughing and

wheezing; Dr. Griffin noted Migneault had an audible wheeze and limited air

movement in his lungs.  By March 10, 2011, Migneault had only experienced mild

improvement, and he reported coughing so hard that he lost consciousness several

times.

Between appointments with Dr. Griffin, Migneault reported to the emergency room in June of 2011 with acute exacerbation of his COPD; he had been using his nebulizer and Albuterol without any relief. He responded well to medication administered in the emergency room and was discharged.

On July 6, 2011, Dr. Griffin again saw Migneault, noting that while he had been experiencing severe COPD symptoms during and between his last two visits, he reported feeling "pretty good." (Tr. 887) During this visit, Dr. Griffin also noted that Migneault's forced expiratory volume (FEV) levels, last taken in 2010 by Dr. Tillman, were consistent with moderate COPD. On August 5, 2011, Migneault visited Dr. Griffin and complained of chest pain and coughing; after an electrocardiogram, Dr. Griffin noted no changes. The doctor also determined Migneault's COPD remained moderate. On September 15, 2011, Dr. Griffin noted Migneault stable and "doing well" with his COPD, and he also found Migneault "doing well" in relation to his chest pain and history of heart disease. (Tr. 882-83) On November 28, 2011, Dr. Griffin's notes reported Migneault continued to do "very well" and had stopped smoking entirely. (Tr. 880) On December 21, 2011, Dr. Griffin reported Migneault's COPD to be much improved, as evidenced by improved airflow to the lungs and absence of a wheeze. He credited the improvement to Migneault successfully quitting his smoking habit.

In January 2012, Migneault again reported to the emergency room because of coughing and an upper respiratory infection, which exacerbated his COPD.

On January 17, 2012, Migneault returned to Dr. Griffin with lingering exacerbated COPD symptoms because of the same upper respiratory infection. Dr. Griffin prescribed a new medication, Spiriva, for the COPD. When Migneault returned on February 16, 2012, he had responded to the new medication, and Dr. Griffin found him to be "doing very well." (Tr. 870) Despite that, Migneault reported he had chest discomfort when he exerted himself, and he agreed to undergo cardiac catheterization. The procedure indicated he suffers from nonocclusive coronary disease. On March 19, 2012, Migneault returned to Dr. Griffin after his catheterization, and he again appeared to be "doing very well" with his COPD symptoms. (Tr. 868) By June 15, 2012, Migneault was again experiencing wheezing and reported he was smoking four to five cigarettes per month. Dr. Griffin advised Migneault to stop smoking entirely because "his lungs do not have anything left to give to his disease." (Tr. 866) On September 17, 2012, Migneault had his final visit with Dr. Griffin prior to his hearing before the ALJ. Dr. Griffin noted exacerbated COPD symptoms and a respiratory tract infection, which both contributed to Migneault's wheezing and diminished ability to breathe. However, Migneault reported having quit smoking entirely once again.

D. <u>Medical Records – Mental Impairments</u>

Migneault has been receiving treatment for mental health issues since at least 2001, when he attempted suicide. Since then, he has made other attempts at suicide, and several physicians have treated him for various mental impairments, most frequently diagnosing him with major depression and bipolar disorder. (Tr. 562)

*Clinical Treatment Notes*

The record contains a series of progress notes signed by treating physician Dr. Ahsan Syed during the period after Migneault filed for SSI and before the ALJ hearing. (Tr. 742-81) The treatment notes indicate Dr. Syed's purpose in meeting with Migneault was to monitor his medication. On March 1, 2011, Migneault reported to Dr. Syed feeling depressed and irritable; he also indicated having serious difficulty controlling his anger and said that he had physically struck his ex-wife in a fit of rage. Dr. Syed's notes suggested Migneault's behavior throughout their session reflected frequent changes in mood and irritability, and he assigned Migneault a GAF score of 55.[1] By April 8, 2011, Dr. Syed revised Migneault's GAF score to 60 and noted an increased stability in mood. Migneault indicated he was feeling better. He continued to do well and remained compliant

---

[1] A GAF score considers "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." *Diagnostic and Statistical Manual of Mental Disorders, Text Revision 34* (4th ed. 2000). A GAF score of 51 to 60 indicates moderate symptoms (*e.g.*, flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (*e.g.*, few friends, conflicts with peers or co-workers). *Id.*

with his medications through appointments with Dr. Syed in May and August of 2011. On October 4, 2011, Migneault reported to Dr. Syed that he had mood fluctuations, constantly felt irritable, had low energy, and felt unmotivated. He requested a change in medications because he believed them to be causing hand tremors, and Dr. Syed agreed. (Tr. 757) By February 7, 2012, those previously reported issues had been resolved, and the new medication (Depakote) was effective in again stabilizing his mood. Migneault indicated no new issues and continued reporting to Dr. Syed that he was doing well during subsequent visits (May, July, and August 2012) leading up to the hearing with the ALJ.

During the same period of time, Migneault saw psychologist Dennis Campbell for individual therapy. (Tr. 782-90) On June 15, 2011, Migneault reported being extreme irritable and having explosive angry outbursts that negatively affected his interpersonal relationships. By July 13, 2011, Migneault continued to report irritability but said it had been improved by his medication; the record indicates he continued to feel this way until December of 2011. During an August 10, 2011 session, Campbell noted Migneault to be very quiet and guarded. Despite this, Migneault reported no problems and appeared to be coping with a move to a new home. The session was cut short because Campbell found him to be limited in his ability to interact. Campbell reported Migneault's affect to be similar (reserved and guarded) in their next treatment session on September 12,

2011.  In four meetings between January and July of 2012, Migneault reported no new mental symptoms and remained compliant with and benefited from his medications.  During this period, Migneault reported helping a friend plant a new garden, planning an upcoming fishing trip, and working to quit smoking.  (Tr. 789)

*Mental Health Reports*

Psychologist Campbell also completed a Physician's Assessment for Social Security Disability Claim on Migneault's behalf on May 18, 2011.  (Tr. 860-63) The assessment includes the following mental health diagnoses for Migneault: bipolar disorder, polysubstance dependence (in remission), and borderline intellectual functioning; Campbell also noted Dr. Syed's assessment of a GAF score of 60.  Campbell further identified lack of occupation and medical concerns as stressors on Migneault's mental health.  According to the report, Migneault's bipolar disorder was stable at the time, and Campbell believed Migneault was able to complete his activities of daily living.  Campbell concluded Migneault would struggle to maintain attention and concentration for more than 15 percent of a workday, be very inconsistent with the quality of his performance, and require frequent breaks and coaching to manage job stresses.  He estimated Migneault would be absent from work for more than three days per month due to his mental impairments.  In a mental capacity assessment, Campbell concluded Migneault would suffer from marked difficulty to complete a normal workweek without

interruption because of psychologically based symptoms, and Migneault would suffer from moderate difficulties in most other areas of sustained concentration and persistence, social interaction, and adaptation.

The record also contains the reports of consulting psychologist Patrick Finder. Finder conducted a lengthy examination of Migneault on December 6, 2010, two months prior to the date on which Migneault claimed disability. (Tr. 556-62) The assessment by Finder diagnosed Migneault with recurrent and severe major depression, generalized anxiety disorder, bipolar disorder, and a GAF score of 50.[2] Finder found finances, inability to access health care, and limited physical mobility as psycho-social stressors on Migneault. Though Finder's report is a psychological evaluation, he took stock of the physical impairments Migneault reported, and he determined that poor physical health exacerbated Migneault's mental impairments. Because of the combination of the physical and psychological issues, Finder concluded with the assessment that "it is very unlikely that [Migneault] would be able to obtain or maintain any type of employment." (Tr. 562)

Mark Maddox, State agency psychological consultant, submitted a Psychiatric Review Technique finding that Migneault suffers from severe

---

[2] The DSM-IV describes a patient with a GAF score of 50 as experiencing serious symptoms (*e.g.*, suicidal ideation, severe obsessional rituals, frequent shoplifting) or serious impairments in social, occupational, or school functioning (*e.g.*, no friends, inability to keep a job). *Id.*

impairments but is not limited in his ability to perform simple work. (Tr. 721-31) Maddox noted Migneault's diagnoses of major depression, bipolar disorder, generalized anxiety disorder, and polysubstance abuse. He reviewed mental treatment records from 2010, noting a few instances in which Migneault complained of symptoms, such as depressed feelings and irritability. However, Maddox noted overall that Migneault's impairments seemed to be controlled by medication, and that his reports of his daily activities were not completely consistent with his complaints about the limiting effects of his symptoms. Maddox also completed a Mental Residual Functioning Capacity (RFC) Report. In it, he determined Migneault to be moderately restricted in his ability to understand and remember detailed instructions, to suffer some moderate difficulties in maintaining concentration, persistence, or pace, and to suffer moderate difficulty in social interaction, and to suffer moderate difficulty in the ability to respond to changes in the work setting. He also noted Migneault had no repeated episodes of decompensation.

    E. <u>Vocational Expert Testimony</u>

    Dr. Thomas Mitchell, a vocational expert, testified at the hearing that a claimant with impairments and limitations set out in the ALJ's hypothetical questions would not be able to perform Migneault's past relevant work as a stocker, a mechanic, or an auto body repairman. Dr. Mitchell testified that such a

claimant would be able to perform the work of a cashier, a position that Migneault previously held. In addition, Dr. Mitchell suggested two other occupations that someone with Migneault's limitations could perform: hand laborer, food operations worker, and hand packager. The claimant's attorney then asked Dr. Mitchell whether any of these jobs would be feasible if the employee required significant break periods, and Dr. Mitchell answered that they would not be feasible. Similarly, Dr. Mitchell testified that if an employee were to be off task for more than 10 percent of the day, he would not be capable of performing substantial gainful activity.

### III.   **New Evidence Before the Appeals Council**

The new evidence submitted by Migneault to the Appeals Council after the ALJ's decision offers further information solely about his physical impairments. The evidence consists of three documents, a clinical treatment record, a Physician's Assessment for Social Security Disability, and a Medical Assessment of Ability to Do Work Related Activities, all completed by Dr. Griffin on November 8, 2012. (Tr. 899-903) In his report, Dr. Griffin assigns Migneault diagnoses of severe COPD, bipolar disorder, hand tremors, hypertension, and transient ischemic attack. He determined that Migneault would need to spend three to four hours of the workday resting because of his decreased energy and increased shortness of breath. Even while working, Migneault would not be able to perform

work activities at a regular pace.  Dr. Griffin believed Migneault may be able to keep punctual work attendance but expressed doubt that he would be able to keep a regular work schedule.  Like Dr. Campbell, Dr. Griffin estimated Migneault would miss an average of three days of work per month.  Shortness of breath and lack of energy also led Dr. Griffin to conclude he would not be able to perform "light work," as defined by the Commissioner.  In his Medical Assessment checklist, Dr. Griffin indicated that sustained lifting, carrying, standing, and walking were not possible; he also determined Migneault's maximum ability to sit throughout the day would be for three to four hours at a time.  The clinical record from Dr. Griffin's treatment of Migneault on November 8, 2012 notes that his COPD is stable; however, it also indicates that wheezing and diminished ability to breathe are constant baseline symptoms he experiences.  Additionally, the notes describe the appearance of a new essential hand tremor in both hands.  Dr. Griffin noted the tremor disappears with voluntary movements, and he prescribed Propranolol for this issue.  Finally, Dr. Griffin indicated he again encouraged Migneault to stop smoking.

## IV.  Standard for Determination of Disability Under the Social Security Act

Social Security regulations define disability as the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or

can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 416(i)(1); 20 C.F.R. § 416.905(a).

Determining whether a claimant is disabled requires the Commissioner to evaluate the claim based on a five-step procedure. 20 C.F.R. § 416.920(a)(4). First, the Commissioner must decide whether the claimant is engaging in substantial gainful activity. If so, he is not disabled. Second, the Commissioner determines if the claimant has a severe impairment which significantly limits his physical or mental ability to do basic work activities. If the impairment is not severe, the claimant is not disabled. Third, if the claimant has a severe impairment, the Commissioner evaluates whether it meets or exceeds a listed impairment found in 20 C.F.R. Part 404, Subpart P, Appendix 1. If the impairment satisfies a listing in Appendix 1, the Commissioner will find the claimant disabled. Fourth, if the claimant has a severe impairment, and the Commissioner cannot make a decision based on the claimant's current work activity or on medical facts alone, the Commissioner determines whether the claimant has the residual functioning capacity (RFC) to perform past relevant work. If so, he is not disabled. Fifth, if the claimant cannot perform past relevant work, the Commissioner must evaluate whether the claimant can perform other work in the national economy. If not, he is declared disabled.

For claimants alleging mental impairments, the Commissioner has supplemented the familiar five-step sequential process discussed above with additional regulations dealing specifically with mental impairments. 20 C.F.R. § 416.920a. As relevant here, the procedure requires an ALJ to determine the degree of functional loss resulting from a mental impairment. The ALJ considers loss of function in four capacities deemed essential to work. § 416. 920a(c)(2). These capacities are: (1) activities of daily living; (2) social functioning; (3) concentration, persistence or pace; and (4) episodes of decompensation. § 416.920a(c)(3). After considering these areas of function, the ALJ rates limitations in the first three areas as either: none; mild; moderate; marked; or extreme. The degree of limitation in regard to episodes of decompensation is determined by application of a four-point scale: none; one or two; three; or four or more. *See* § 416.920a(c)(4).

## V.    ALJ's Findings

The ALJ applied the five-part sequential evaluation to Migneault's claim as required by 20 C.F.R. § 416.920(a). First, the ALJ found Migneault was not engaged in any substantial gainful activity and had not been so engaged since well before February 8, 2011, the date on which he claimed disability. The ALJ also determined Migneault suffered from several severe impairments material to the determination of disability, including bipolar disorder, major depressive disorder,

generalized anxiety disorder, obesity, COPD, and nonocclusive coronary disease. Additionally, the ALJ found Migneault suffered from the non-severe impairments of mild knee chondromalacia and hand tremors.

At step three, the ALJ found that none of Migneault's impairments met or exceeded the equivalent of the impairments listed in the regulations.  With regard to Migneault's physical impairments, the ALJ determined the presented medical records failed to establish severe physical impairments that met the listed requirements in § 3.02 of 20 C.F.R. Part 404, Subpart P, Appendix 1.  § 3.02 sets requirements for various symptoms and indicators of severe COPD.  With regard to Migneault's psychological impairments, the ALJ determined that Migneault's mental illnesses do not meet the requirements listed in §§ 12.04, 12.06, or 12.09 of 20 C.F.R. Part 404, Subpart P, Appendix 1.

Having determined Migneault's impairments do not meet the listed requirements, the ALJ made a determination of Migneault's RFC.  In assessing Migneault's physical RFC, the ALJ determined Migneault would be able to perform light work, as defined in 20 C.F.R. § 416.967(b).[3]  However, based on the severity of Migneault's impairments, the ALJ imposed several limitations on the conditions in which Migneault would be able to work.  The ALJ determined

---

[3] "Light work" requires "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds….a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls." § 416.967(b).

Migneault could occasionally stoop, kneel, crouch, crawl, and climb ramps and stairs. He entirely restricted Migneault from climbing ladders, ropes, and scaffolds, being exposed to concentrated pulmonary irritants, and working in areas with poor ventilation. The ALJ further limited Migneault to simple, routine work with superficial interaction with others, no higher than the SVP 2 level. (Tr. 17)

At step four of the sequential evaluation, the ALJ used the RFC to determine Migneault would be capable of performing past relevant work as a cashier, rendering him not entitled to disability income. Additionally, the ALJ also proceeded to step five of the evaluation despite determining at step four that Migneault is not disabled. At step five, the ALJ found Migneault would be able to perform other jobs that exist in the national and local economy, such as hand laborer, food prep worker, and hand packager.

## VI. <u>Standard of Review</u>

Review of the Social Security Administration's rulings under 42 U.S.C. § 405(g) requires a district court to determine whether the Commissioner's findings are supported by substantial evidence on the record. 42 U.S.C. § 405(g). Substantial evidence, though less than a preponderance, is such that a reasonable mind would find it adequate to support the Commissioner's conclusions. *Johnson v. Apfel*, 240 F.3d 1145, 1147 (8th Cir. 2003). Review of the Commissioner's conclusions is deferential, and as long as the record provides substantial evidence

in favor of the outcome, the Commissioner's decision cannot be reversed simply because the record also supports an alternative outcome.  *Clay v. Barnhart,* 417 F.3d 922, 928 (8th Cir. 2005).  To determine whether substantial evidence exists in the record for the ALJ's opinion, this court is required to review the entirety of the administrative record and consider:

1)  the credibility findings made by the ALJ;

2)  the education, background, work, and age of the claimant;

3)  the medical evidence from treating and consulting physicians;

4)  the plaintiff's subjective complaints relating to exertional and nonexertional impairments;

5)  any corroboration by third parties of the claimant's impairments; and

6)  the testimony of vocational experts, when required, which is based upon proper hypothetical questions.

*Stewart. v. Sec'y of Health and Human Servs*., 957 F.2d 581, 586 (8th Cir. 1992). This court must consider all evidence in the record, regardless of whether it supports or detracts from the ALJ's decision.  *Finch v. Astrue*, 547 F.3d 933, 935 (8th Cir. 2008).

## VII.  **Discussion**

Migneault argues that the ALJ's decision is not supported by substantial evidence, but a review of the ALJ's opinion demonstrates that this argument fails.

I first review the support for the ALJ's opinion based on the record initially presented, and I then consider the effect of the new evidence submitted by the claimant to the Appeals Council.

The ALJ followed the proper five-step sequential process in evaluating the claim, and he found the claimant "not disabled" at step four because his RFC allows him to perform past relevant work. The ALJ appropriately considered Migneault's testimony and evidence in the record regarding his daily activities. The ALJ also took particular note of Migneault's sustained daily interactions with his ex-wife, his occasional trips to the grocery store, and anecdotes involving shoveling snow and using a lawnmower. (Tr. 20) Upon considering this evidence, the ALJ determined Migneault's testimony about the intensity, persistence, and limiting effects of his physical and mental impairments lacked some credibility because his RFC assessment indicated he could do more. The ALJ also considered the third party corroborative reports of Migneault's impairments submitted by his ex-wife and a friend; he ultimately gave little weight to these reports because they contradicted other evidence on the record and because they did not come from disinterested third parties.

Similarly, the ALJ found Migneault's clinical treatment records from psychologist Campbell and Dr. Syed and a consulting report from psychologist Maddox indicated the claimant's mental impairments were under control through

the use and monitoring of his medication.  The ALJ assigned little credibility to Campbell's report because he found it inconsistent with Campbell's treatment records, which indicated Migneault's mental impairments had largely been stabilized. Nevertheless, in making the RFC assessment, the ALJ took care to impose some restrictions on the level of social interaction required in order to limit Migneault's exposure to situations that might exacerbate his mental symptoms. (Tr. 19)

With regard to his physical impairments, the ALJ determined Migneault to be limited by his moderate COPD, despite apparently finding there to be a dearth of medical evidence in the record.  (Tr. 20)  In reaching this conclusion, the ALJ appropriately took into consideration the treatment records completed by Dr. Griffin and the emergency room reports in which Migneault presented with COPD or chest pain symptoms.  To accommodate this limitation, the ALJ imposed further restrictions on the RFC assessment to avoid work that would exacerbate Migneault's COPD.

Finally, the hypotheticals posed to the vocational expert accurately took into consideration Migneault's physical and mental limitations, his age, education, and work experience.  The ALJ gave weight to the vocational expert's testimony that Migneault would be able to return to his past relevant work as a cashier.  The ALJ further took into account Migneault's RFC and the limitations therein when

suggesting other feasible jobs available in the national and local economy, such as hand packaging or food prep.  In sum, the ALJ thoroughly canvassed the extensive record and reached a conclusion that enjoyed the support of substantial evidence.

The new evidence before the Appeals Council deals solely with Migneault's COPD and a hand tremor, and it does not alter the substantial evidence on the record in support of the ALJ's ruling for four reasons.  First, the evidence before the ALJ established that Migneault suffers from moderate COPD, and the new records from Dr. Griffin do not suggest a more serious diagnosis or new information about Migneault's symptoms.  Dr. Griffin does note the presence of a "new" essential hand tremor. [4]  (Tr. 902)  Second, where a claimant fails to comply with medical advice, that noncompliance can be considered evidence inconsistent with a treating physician's medical opinion that erodes that opinion's controlling weight.  *Wildman v. Astrue*, 596 F.3d 959, 964 (8th Cir. 2010).  Both the original and new treatment records submitted by Dr. Griffin indicate Migneault's breathing difficulties noticeably improve when he stops smoking, but he continues to smoke. Migneault has made many attempts, some more successful than others, to stop smoking, but it appears he has always relapsed into the habit.  Indeed, in the new clinical treatment record completed by Dr. Griffin, his final note is to continue

---

[4] In the ALJ's assessment of Migneault's impairments, hand tremors were taken into consideration as a non-serious impairment.  Dr. Griffin's notes here do not suggest this new tremor is severe or considerably different than those noted elsewhere in the record.  *See* Tr. 15, 757, 791.

encouraging Migneault to stop smoking. (Tr. 903) This discounts the credibility that would otherwise attach to Dr. Griffin's opinion as Migneault's treating physician.[5] Third, the Medical Assessment, which contains the majority of Dr. Griffin's opinions on Migneault's limitations takes the form of a checklist, which the Eighth Circuit has consistently held is of limited value because of its conclusory and incomplete nature. *Holmstrom v. Massanari*, 270 F.3d 715, 721 (8th Cir. 2001); *see also Wildman*, 596 F.3d at 964. Fourth, Dr. Griffin contends Migneault is too weak and short of breath for full time work, and that he would need to rest for three to four hours during an eight hour work day, but there is no evidence in Dr. Griffin's medical records to support such an extreme rest limitation. The limitations already conceived in the ALJ's RFC assessment partly address these concerns in that they limit Migneault to light work, and they rule out activities that would require physical exertion that would exacerbate his COPD.

## VII.  <u>Conclusion</u>

For the aforementioned reasons, even when considered in light if the additional evidence submitted to the Appeals Council, the ALJ's determination that

---

[5] The Eighth Circuit in *Pate-Fires v. Astrue* held that noncompliance was not a proper basis for rejecting a treating physician's opinion where it was attributable to a "manifestation of mental disorders." *Pate-Fires v. Astrue*, 564 F.3d 935, 943 (8th Cir. 2009) (finding the claimant's schizoaffective disorder caused her to avoid taking her psychiatric medication). However, this case, like *Wildman*, is distinguishable from *Pate-Fires*. *See Wildman*, 596 F.3d at 966. While Migneault suffers from mental disorders, there is no support for the argument that his continued smoking stems from his depression, bipolar disorder, or mood disorder.

Migneault was not disabled is supported by substantial evidence in the record as a whole and the decision should therefore be upheld.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is affirmed.

A separate judgment in accordance with this Memorandum and Order is entered this same date.

CATHERINE D. PERRY
UNITED STATES DISTRICT JUDGE

Dated this 19th day of October, 2015.